If you are ready, we're ready to hear you. And just a reminder, the clock shows 15 minutes, and that is all of your time, including rebuttal, and it's your responsibility to try to save anything for rebuttal that you'd like. Thank you. Your Honors, my name is Kelly Behrens. I represent the respondent, Wolf Creek Nuclear Operating Corporation. The respondent operates a nuclear power plant in Burlington, Kansas. Before this court is a relatively narrow issue. The law is basically agreed on. The application of the law is in dispute. At this power plant, there are four buyers. They purchase everything that this plant uses with the exception of nuclear fuel. And there is no question that these buyers were originally considered managerial employees. In 2000, there was a board hearing over whether or not the buyers should be considered normal rank-and-file employees or whether they should be considered managerial employees. The National Labor Relations Board at the regional level agreed that they were managerial employees, ruled them as such. This ruling was never appealed. How many years, I was just going to say, how many years passed between that ruling and the current ruling? Sixteen. About 16 years the process began again, and I think you can argue that it's actually 18 as the process has taken some time. Does it matter how much time has passed? No. Can these things be revisited after many years? Res judicata is res judicata. Unless you have materially changed circumstances, the original ruling controls. So if this would have been 40 years ago, assuming they couldn't prove material change circumstances, we'd be in the same position? That is exactly correct. And if there were material change in circumstances, then they're free to reconsider? That is correct as well. So I guess the first question is, do we have a material change in circumstances? It is the respondent's position that we do not. And what's the standard of review? The standard of review is whether or not there is sufficient evidence to justify the respondent declining to comply with the board's rules. And that sufficiency is substantial evidence? Yes. And that's true with regard to material change in circumstances as well? Yes. However, that burden at the lower level is on the board, not on the employer or respondent. But our review is whether there is substantial evidence to support the finding? Correct. When the petition was filed 16 years later, the respondent filed a motion to dismiss the petition because of the previous regional director's ruling and the res judicata. The board at the regional level held hearings. At the hearings, testimony obviously was taken. And I would draw your attention at least to the respondent's initial brief, pages 30 to 37. In that hearing, 34 steps of the buyer's actual work process were testified about. At all 34 steps, the buyer's activities in 2016 were exactly the same as the buyer's activities in 2000. Despite this, the regional director... They got substantial help 16 years later, didn't they, in exercising those duties? I don't think substantial help... I think the manner in which they exercise those duties changed. Just as the last 16 years, the way that we conduct our everyday lives has changed. Well, the frequency with which they performed a number of those duties changed drastically, didn't it? Yes, but that does not change either the responsibility or the significance of their managerial activity. You are referring, I think, to the fact about competitive biddings and the decline in competitive bids. Yes. Yes. There's agreement that there's been a distinct decline. There is no dispute. That is accurate. And I think the best way to look at the three changes that were cited, which is the use of the computer system, reduced competitive bidding, and the change, the alleged change in the buyer's role in evaluating bids, I think a better way to look at those might be to look at each of them in the context of an attorney. Buyer's activities, we're not quite as familiar with. Attorney's activities, we are. Those of us who have been practicing law a long time, before computers, realized how this practice has changed. We used to go in the library. We went to find, digest, select cases, bring stacks of books back to the table, review the books, decide which cases we wanted. We didn't have copiers, wrote down what we needed, and left. Today, that's all done sitting at the desk with a computer. The manner in which we've secured the information we need has changed. The responsibility and the discretion that we exercise has not changed. Well, hasn't the oversight changed somewhat here? I do not think the oversight has changed any more than, again, to use an attorney's example, seeking input from your client, seeking input from colleagues, seeking input from experts, if it's an arena that you are not totally familiar with, does not change your responsibility as an attorney, does not change these individuals' responsibilities as buyers, as long as they maintain responsibility and the discretion to exercise that responsibility. And they do maintain that. If we were to disagree with you and think there was a material change, do you agree that it is correct that the buyers were not managerial employees? I think if you would say there's a material change, one should go back and review the entire record, because we're talking about three points when, in fact, there are 30 points of managerial exercise that the buyers exercise throughout their career. Well, you know, you named 30 points, but I looked at those, and there's quite a few of them that you list in that process that the buyers aren't involved in at all, steps three through eight, 17, 25, 26. I mean, there's a whole lot of things you list that are about other people making the initial decision to purchase, and the purchasing authority is determined by someone other than the buyers, correct? Correct. But what's significant there is those are the very facts and findings that were relied upon in 2000 to reach the conclusion that these are managerial employees. But my question was, assuming for the moment that the panel thinks there's been a material change that would have allowed reevaluation of this issue, what do you point to in saying that the buyers are, in fact, managerial employees? What I point to is the fact that their discretion has not been changed in any marked way. Their responsibility has not been changed in any marked way. And the processes that they go through are essentially the same as the processes they went through in the year 2000. They change in manner, not in form. What's the difference in numbers of single-source suppliers over the last 18 years? The record indicates that there's been a decline in single-source. The record does strike that. The record does not indicate what number of single-source purchases occurred in 2000. The record indicates, though, that in 2016, roughly 10% of purchases are on a multi-supplier. So 90% are single-source. Single-source. Now, okay. Yes. With the single-source, the only question is time of delivery? No, with single-source, you have price. Okay, price and time of delivery. You have terms of payment. You have warranties. You have miscellaneous other contract responsibilities. You have credit terms. You have shipping, type, timing, cost, carrier. There's multiple elements. And most of those terms are already in the impact system, right? Well, they're in the impact system just in the same way that an attorney today, when they are negotiating an agreement to purchase a building or something else, has a pro forma document that they will go back and rely on and work off of. But aren't all these other factors set by the time the buyer makes the decision? The buyer's decision is based solely on price and timing. I believe that the buyer negotiates these other items as well, and there is evidence that the buyer has, in fact, not always followed that policy or followed the suggestions. They have the discretion to move outside of that. So they have the discretion to change the terms of the warranty? Not the terms of the warranty, but, say, timing of delivery. That's what I'm saying. Those are the only two things they address. And price. Delivery and price, correct? And price within pretty clear limits, right? I would say price is. . . Their wiggle room on price is determined by the person who requests the purchase, what their purchasing authority is. Well, the wiggle room on price is determined by the person who requests, and it also is determined by negotiating with the seller. And the record indicates that in 2015, the buyers saved the corporation roughly $330,000 through their negotiations. In 2000, how many competitive bids were there percentage-wise? The record does not indicate what that number is. But I would concede that it was more than are today. Okay, back in 2000. Yes. I believe that the finding was that there was a significant change. Yes. A significant reduction in competitive bidding. That is correct. Do you agree with that characterization, that there's a significant reduction? I think significant is a broad word in this sense. There's still significant amounts of purchasing in excess of $2 million in 2015. That is competitive bidding. Would you disagree that the reduction in purchases subject to competitive bidding was 90%? I would disagree with that. Isn't that what was found? I think they found that 10% was. I don't think they found that it was 100% previously. I don't believe. So you agree that 90% now is not competitively bidded? That is correct. Okay. And you're at two minutes if you're. I would like to reserve that. Thank you. Okay. Barbara Sheehy for the National Labor Relations Board. I'm going to pick up sort of where we left off there, just because I think there are a lot of questions surrounding what was the competitive bidding amount before and what is it now. Unfortunately, as my opposing counsel just pointed out, the record is not clear from the 2000 decision. If the court looks at, so there's not a number, unfortunately. We know the number now in 2016. We know that's 10% to 15%. There are multiple witnesses that testified. But that begs the question, what was the amount in 2000? Because all bids, even in 2000, were not competitively bid. There were certain parameters for when you would competitively bid. But I think if the court looks at, the best indication we have is the 2000 decision, which is Exhibit A, I believe, and the employer's motion to dismiss. And on page 20 of that decision, you have the regional director in that case saying, in limited situations where they don't competitively bid. So that's the only information we have, is that in 2000, the characterization of non-competitively bid purchases was limited. And we know now that it's 10%. And so I just wanted, that's the best we can come up with, I think, in terms of what it was versus what it is now. But in any event, as Judge McHugh and I think Judge Murphy and Judge Carson all pointed out, there's a specific finding by the regional director and enforced by the board in this case, that there was a dramatic decrease, whether it was 85% before or 15% now, that the evidence showed that it was a dramatic and with that change came, or with that change means then that the union, let's be clear, the union had the burden before the board, before the regional director, to show material change circumstances. The general counsel was on a party to the proceeding before the board. So the union showed then, and it's a non-onerous burden. In fact, the regional director recognizes in the supplemental decision, saying while the evidence, some may not characterize it as overwhelming, it's a non-onerous burden to show that there's been a change. And in his estimation and enforced by the board, there had been a material change such that the board or the regional director could revisit the issue. So the union carried its non-onerous burden. And then the question becomes, 2016, 17, 18, are these buyers managerial employees or employees? And certainly wrapped up in that analysis is what led to the material change decision, because you're looking at the duties. So wrapped up in that analysis is all of these changes that came about when MPAC came in, the dramatic decrease in competitive bidding, and in addition to there being only single source, there are also these alliance agreements that the employer negotiates without the input from the buyers. The employer negotiates these alliance agreements with third-party vendors and sets the terms of sale in those and identifies preferred vendors. So not only do you have single source, meaning you have no alternative who to go to, and again that's the record I think makes clear that that's sort of a function of this is a highly specialized field, highly regulated, the number of suppliers has decreased over the years, and much of the equipment in the facility is 30 years old. So suppliers have naturally sort of moved into other fields or specialized in other things. So not only do you have single source, you also, to the extent that there are multiple sources, you have alliance agreements that the employer has negotiated without the input of the buyers that are dictating the terms of sale. What was the status of the alliance agreements in 2000? You know, I don't think the record speaks to alliance agreements in the 2000. I don't see anything in the unit clarification decision from 2000 that speaks to the alliance agreements. So I don't know. I don't know that the 2000 record shows what the status, how many there were at that point. But I think a reasonable reading of that decision, because that goes into the competitive bidding analysis, I think a reasonable reading of that decision is there wasn't a high level of having circumscribed their process through either single source or alliance agreements themselves. Are alliance agreements addressed at all in the 2000 decision? In 2000, I don't believe so. I don't believe so. But I couldn't absolutely swear to that. Again, I don't believe that they are, no. I believe your opposing counsel would say that all of the things you're talking about really affect the quantity of decisions, but doesn't really affect the quality of the discretion employed by these buyers in their day-to-day activities. How do you respond to that? I think I would point the Court to the supplemental decision from the Regional Director where he says, so this is in direct contrast. In this, it's on page 9 of the decision, the supplemental decision. And the decision says, and it's drawing a direct contrast with the findings from the 2000 decision. And he writes, Buyers now only infrequently locate and select vendors. They continue to make vendor decisions on routine and cheap purchases, but they're guided by the employer's detailed procedures. They almost always select the lowest bidder. Buyers no longer perform technical bid evaluations. They don't add new suppliers without authorization. They don't independently decide which suppliers to utilize for engineered or safety-related materials. And they do not, and I think this is important because this is contrary to what is in Wolf Creek's brief. There is a specific finding that they do not, the buyers do not negotiate prices for goods and services. So I think that's the direct response right there, is that it's not simply a matter of this analogy that, you know, the technology has just simply changed where they go to look for the information. I respectfully disagree that the lawyer analogy makes any sense as it relates to the buyers here. It's not simply that the buyers don't have to consult manuals anymore. They don't have to do anything other than select the single buyer that is available for the purchase. So let me stop you for a minute. So the things you were just talking about, that the decision, you were sort of repeating what was in the decision that we're reviewing, right? Those are the findings, yes. Yeah, so let's talk about the basis for those findings. What's in the record that supports those findings? I mean, for example, we have the single source contracts. What's the cause of the single source contracts? Is that pretty much a natural occurrence because the equipment's getting old and the market isn't supporting multiple vendors? I believe so. I don't know that the record, to be clear, the individuals who testified, there were the four buyers I think that testified, and I don't know that they were in a position to say specifically why the employer has put on or why the employer has now more single source contracts or single source suppliers and alliance agreements than it did before. But you have testimony from those people. Yes, some of them testified that, you know, they're a 30-year-old plant now and they don't have anywhere else to go. So I don't know that the reason for the diminution is there as opposed to it's uncontested that it is there. Right. So does the fact that that's decreased through no action of the company, does that make a difference? I don't believe that that matters, no. The board is going to look at whether the buyers, irrespective of why a change has come about or why a particular employee doesn't exercise independent discretion and judgment. The question is do they? So it's of no moment that the employer, perhaps Your Honor might be correct, that it's through no doing of their own. But the fact remains, the relevant fact, is whether these buyers exercise independent judgment and discretion and the fact that perhaps third-party vendors or the aging of the plant has resulted in the evisceration of that independent discretion and judgment doesn't affect the ultimate conclusion, which is they don't exercise it. You mentioned, did I understand you correctly, that on single source contracts these buyers do not now negotiate price? Did I misunderstand you? The board found specifically, yes, that the buyers do not negotiate prices. On single source? On single source or otherwise. At all? At all, no. And is the source of that evidence the testimony of the four buyers? Yes, yes. And in that respect, I noticed that the ultimate vote among the buyers on the union vote was 3-1. Right. Was there a conflict in the testimony of those four buyers on these issues? A conflict of interest? No, a conflict in their testimony. Oh, oh, oh, sorry. I don't believe so, no. The only one who the – I don't believe any of the buyers testified that they negotiate the terms of the purchase. Rather, that they negotiate the price. And, in fact, if you look at the – I believe it's in their reply brief. The employer cites to – I want to say it's transfer page 207 to show that, in fact, these buyers negotiate. And what that – and that's the only citation in the record that they offer. What that has to do with – that's a supervisor. That supervisor leans testifying, and I would encourage the court to look a couple pages before and a couple pages after. And it's very unclear what he means when he says – so, remember, it's the supervisor testifying. It's very unclear what he means when he says they negotiate. Because, at first, he's using the word negotiate, and he's talking – and it's assumed – my read of the testimony is that it's assumed that he's talking – the buyer is negotiating with the vendor. On cross-examination, he is asked more pointed questions about what exactly the negotiation means. And it is – he's asked, does it have to do – does the negotiation have to do with the buyer? And I believe he says it doesn't. It has to do with the vendor. So, I think he specifically asked, does the buyer go to vendor A and vendor B and say, I can get this price from this person. Can you do better? And he says, no, that is not at all what they're doing. So, I would encourage – and it's very – it's unusual. I can't – I don't fully understand exactly what he's being asked and what he's saying. But to the extent – What about on the single source? Do they negotiate price? No, I don't – there's nothing – there's no record – there's no record testimony that the buyers negotiate single source or competitive bidding pricing. Do any of the buyers say that they don't? I believe so. And I think we cite in – I would encourage the court – we have the citations to the transcript testimony in our facts section where we would talk about what the buyers would testify to. Right. So, the citations would be – the citations of the specific testimony from the buyers would be in our brief. Let me ask you this. The threshold for competitive bidding was $5,000 back in 2000, and then it was raised. It's now $50,000, which would make a significant difference in what gets competitively bid. I mean, that was a management change without input from the buyers. Is that correct? That's correct, yes. The buyers testified that they had no input in changing the competitive bidding threshold. I don't mean to confuse the two issues, but they are related. What was the evidence in 2000 as to price negotiation, whether it was single source or multiple source? So, I have the decision itself. I don't have access to the testimony that was offered, but in that decision, the RD in that case is on page 23, and again, this is Exhibit A, the employer's motion to dismiss. There's a finding. The buyers can negotiate a purchase price for goods and services. So, I have to assume – I haven't seen the record evidence for that, but that's the specific finding from the regional director in that case, and again, drawing the contrast, you have in that supplemental decision a specific finding that they do not now negotiate the price for goods and services. All right. I just want to make sure, because you are very unequivocal. If I look in the record for 2015, all the evidence will say that there is no price negotiation by the buyer with the seller. I believe that's accurate. Yes, I don't recall a buyer testifying. So, again, there's the testimony from Weems that I find a little confusing. But aside from that, I don't recall any of the four buyers who testified saying or testifying that I negotiate the price for goods and services. All right. What about the flip side? Did some or all those buyers testify in 2015 that they do not negotiate price, whether it's multiple supplier or single supplier? That I'm less clear on. I would rely on what we've put in the brief. I don't recall that, so I don't want to say something that's not true. Then I guess my question is, was the source of the evidence they do not negotiate price? It sounds like there's no evidence. Well, no. So let's back up. I think there is evidence. I just don't know if all four testified that I do not, as opposed to do you or don't you. But I believe there is evidence. I just don't recall if it's all four that testified. But let's back up. At the beginning of the process, when we're talking whether there's a material change, the burden is on the union. When we're talking about excluding somebody from the act, to the extent that there are holes in the evidence, that is on the employer. The employer has the burden to show that they're excluded. So if they're going to hang their hat that these employees are managers because they negotiate price and good, prices for goods and services, then the burden is on them to show. Well, that's step number two, though. You don't get there unless the union proved a material change. Right, absolutely. And so you'd agree, wouldn't you, that the union had a burden to prove that there was a difference between 2016 and 2000, and to do that, we'd have to know what they presented in 2000. Right, so absolutely. There's a non-onerous burden on the part of the union, absolutely, at the beginning part of this process to show that the 2000 decision can be revisited. And the board found three factors showing materially changed circumstances, but only one of those, the board, in a footnote, acknowledges that one of those alone was sufficient, the change in the amount of competitive bidding. So once they've satisfied and gotten over that non-onerous burden, and all that happens now is you re-look at the decision. It's not the union had barely any burden, and now all of a sudden these employees are going to no longer be considered managers. It's just getting over the hurdle, the low hurdle, of showing we can revisit over 16 or 17 years things have changed. We've shown enough that we can revisit this decision. So absolutely, the union had a burden at the beginning, but then once you are in the analysis of are these particular buyers employees or managers, at that point, the evidentiary burden is on the employer to show the exclusion from the act. Are there any other questions? I see I'm over my time. Thank you very much. We'd ask for full enforcement. Thank you. And would you please add one minute and 14. She was over one minute. Yeah, just to add that, too. Thank you. I would like to address the question that Judge Murphy asked, which is, was there a conflict in testimony? And the answer is yes. If you go to page 38 of the respondent's initial brief, you will find that a Betty Saylor testified. She was a buyer in 2000 and testified that the process of being a buyer is the same no matter what system you're in, and that although MPAC gave us automation, what we did to our job didn't change. Were any of the other three buyers present in 2000? I do not know that. But I know that testimony was not contradicted at all. Oh, okay, so it was not contradicted in any way by the other three. That is correct. Were you counseled below? No, I was not. Was that question, that specific question to which this particular buyer responded, was it asked of the other three? I do not know that either. Would you agree that if there is a conflict on that issue in the evidence between one of the three other witnesses and the witness you cited, then it was up to the decider to make a judgment? I would agree with that. However, I am quite sure that there is no evidence in the record to the contrary. I would also draw your attention to page 51 of the respondent's brief, in which they discuss the errors a regional director made when ignoring undisputed testimony, finding that the Wolf Creek buyers, when he concluded they neither make the ultimate decision to acquire materials or approve the acquisition materials. It is uncontested that the Wolf Creek buyers have for at least 18 years made this ultimate decision. It is in the record. And it is also in the record that Wolf Creek relied on buyers' input and opinion when formulating, determining, and increasing the monetary limitations on items to be competitively bid from $5,000 to $50,000. That is in answer to your question. The buyers did have an input in that decision. So your opposing counsel was telling us that the competitive bidding by itself, the decrease in competitive bidding by itself was enough to have a material change. From your understanding of the case, was that the case that was put onto the board, or was it primarily a change in technology case? It was primarily a change in technology case. These other findings came out of, I don't want to call them left field, but I think they were unexpected because I have talked to counsel that was involved in the hearing. And that is my time. Thank you. Thank you very much. We will take the matter under advisement and issue a decision as soon as we can. Appreciate counsel's help with it.